OPINION OF THE COURT
Sylvia G. Ash, J.
This action arises out of a utility worker’s fall into an open trench in a roadway at the New South Ferry Terminal Structural Box, a major construction project in Manhattan. Along the perimeter of the trench and at the depth of one to two inches below the road surface ran a horizontal I beam with the flange width of about 12 inches. On October 31, 2005, plaintiff, Guiseppe Tornabene, was walking on the flange when he fell into the trench. As a result of the fall, he injured his right hand and re-injured his right shoulder. He has brought this action against (1) the roadway owner, the City of New York; (2) the project owner, the New York City Transit Authority (incorrectly sued herein as MTA New York City Transit Authority); (3) the general contractor Schiavone Construction Co., Inc./Granite Halmar Construction Company, Inc., a joint venture (incorrectly sued herein as Schiavone/Granite-Hal Mar), and its member Schiavone Construction Co., Inc. (collectively, the joint venture); and (4) a subcontractor for the relocation of utilities at the project, Roadway Contracting, Inc. He asserts that defendants are liable to him for his injuries under Labor Law § 240 (1) for failing to provide him with protection from elevation-related risks, and further under Labor Law § 241 (6) for failing to barricade the trench to prevent him from falling inside. He also asserts *995 claims for negligence and violation of Labor Law § 200.[2] Defendants have joined issue, interposing cross claims against one another for contribution and indemnification. The City, the Transit Authority, and the joint venture (collectively with the joint venture, the joint venture defendants) are represented here by single counsel, while Roadway Contracting is represented by separate counsel.[3] Discovery having been completed, plaintiff has moved for partial summary judgment on liability on his cause of action under Labor Law § 240 (1), while defendants have moved or cross-moved for summary judgment dismissing plaintiffs complaint and codefendants’ cross claims.[4] By short-form order, dated May 29, 2013, the court requested additional documents from the parties to fill in the evidentiary gaps. The court has received and reviewed such additional documents in the form of two letter submissions with paper enclosures and a CD-ROM with the project’s construction documents.[5]
*996 Pretrial Testimony
Plaintiff, a utility worker with a Verizon subsidiary Empire City Subway Co., Ltd., was working on exposed underground conduits in an open trench. The trench, measuring about 20 feet long, 10 feet wide, and 8-10 feet deep,[6] was excavated in the roadway and was fenced off from vehicular traffic during work hours.[7] During non-work hours, the trench was covered by steel plates that laid together side by side transversely. The plates, when placed across the trench, would rest on the flange[8] of the I beam that ran along all four sides of the trench at the depth of about one to two inches below the road surface to form a rectangular frame. When the plates were laid on the flange, loose strips of rubber (or rubber-like substance) were placed between the plates and the flange to prevent the plates from rubbing against the flange as vehicular traffic passed over the plates.
On Monday morning, October 31, 2005, plaintiff drove his company truck into the construction site, which, as noted, was fenced off from general vehicular traffic during work hours. The trench in which plaintiff was to work that day (and in which he had worked for about a week prior) had already been opened up for him and his coworkers. Although the steel plates had been removed, some loose rubber strips had remained on top of the flange side of the I beam. According to plaintiff, there were no guardrails or barricades around the trench on that day. The ground was dry, and the weather was cool.
Plaintiff, age 36, height five feet, seven inches, weight 165 pounds, wearing his steel-toe work boots with rubberized bottoms, approached the trench and stepped on the flange. He walked on the flange for the length of about seven feet to reach the entrance side of the trench where he descended into the trench using a ladder that had been placed inside the trench. As he was walking on the flange to reach the trench entrance, he did not walk on the rubber strips that rested on top of the flange, explaining that “[i]t [the rubber] was away from the beam” (pretrial deposition tr at 125), suggesting that it was *997 dangerous for him to step on the rubber strips. After working in the trench for over an hour, he decided to take a meal break. He climbed out of the trench and walked off the construction site, albeit without using the flange as a passageway.[9] About a quarter of an hour later, he returned to the construction site to resume his work in the trench. He again stepped onto the flange and started walking toward the trench entrance. As noted, the flange was only about 12 inches wide and was covered in some places by loose rubber strips. This time, however, he was not as lucky as before in reaching the trench entrance. After taking three or four steps along the length of the flange, he stepped onto a piece of a loose rubber strip that protruded beyond the flange edge and fell into the trench, landing 8 to 10 feet below on its rocky bottom.[10] As a result of his accident-related injuries and his preexisting injuries, plaintiff has been unable to return to work.
Claims/Cross Claims against the Joint Venture Defendants[11]
As a threshold matter, the City contends that, as a mere owner of the roadway where the trench was excavated, it bears no statutory responsibility for the happening of plaintiffs accident. The law is well-settled that “ownership of the premises where the accident occurred — standing alone — is not enough to impose liability under [the] Labor Law . . . where the property owner did not contract for the work resulting in the plaintiff’s injuries,” however, liability may nevertheless be imposed if there is “some nexus between the owner and the worker, whether by *998 a lease agreement or grant of an easement, or other property interest” (Morton v State of New York, 15 NY3d 50, 56 [2010] [internal quotation marks omitted and emphasis added]).
Before the court can address the issue of nexus, some explanation of the nature of the City’s underground utility conduits is necessary. The underground conduits, built and maintained by plaintiffs employer Empire, house low-tension electrical wires for transmitting telephone, television, and Internet signals (see generally Alesi v City of New York, 9 AD2d 236, 239 [1st Dept 1959], affd without op 12 NY2d 703 [1962] [describing the City’s separate underground utility systems for low-tension (telephone) and high-tension (power) signals]).[12] The conduits are not dedicated to a particular utility (such as Verizon’s telephone wires) but, in accordance with Empire’s agreement with the City, may be used by other utilities (such as Time Warner’s cable wire). To use an example: if a utility requested access to the underground conduits, Empire would open them up to accommodate that utility’s wires. In that scenario, Empire and the requesting utility would work together, while the City (except for issuing a street-opening permit) would be excluded from the process. A different scenario, however, would arise if the City were to request that Empire relocate its underground conduits to accommodate the City’s needs, such as to make way for a new city sewer. That was the fact scenario in Linea v City of New York (2010 NY Slip Op 32622[U] [Sup Ct, NY County 2010]), in which the court denied the City’s motion for summary judgment, holding that the City’s request to Empire to relocate its underground conduits established a sufficient nexus to subject the City to liability to an injured Empire employee under the Labor Law.
Turning to the facts of this case, the court cannot determine as a matter of law whether plaintiff here was working on conduits to accommodate another utility’s wires (thereby negating the City’s status as an owner under the Labor Law) or whether, in the alternative, plaintiff was relocating the conduits at the City’s request as was the case in Linea (thereby qualifying the City as an owner under the Labor Law). Accordingly, the portion of the City’s motion for summary judgment dismiss *999 ing plaintiffs claims against it on the grounds that it was not a Labor Law owner is denied. The court now turns to consider plaintiffs Labor Law §§ 240 (1), 241 (6) and 200, and common-law negligence claims against the City and the other joint venture defendants, as well as the cross claims which they have asserted against one another.
Plaintiffs Labor Law § 240 (1) Claim
In support of his motion for partial summary judgment and in opposition to defendants’ papers, plaintiff points out that his accident occurred when he “stepped on the rubber and with no beam underneath fell eight (8) to ten (10) feet into the trench” (opening affirmation in support 1i 4 [i]). He maintains that, as he “was not provided with any safety devices to prevent his fall and [because] there were no railings located around the trench in which [he] fell,” this constitutes a prima facie violation of the statute (id. 1i 4 Q]). In opposition to plaintiffs motion and in support of their requests for summary judgment dismissing this claim, the joint venture defendants contend, among other things, that plaintiff was the sole proximate cause of his accident because nothing prevented him from walking on the road surface outside the trench (rather than to walk on the flange) to reach the trench entrance.
Labor Law § 240 (1) provides, in pertinent part, that
“[a]ll contractors and owners and their agents . . . in the erection ... of a building or structure shall furnish or erect, or cause to be furnished or erected for the performance of such labor, scaffolding, hoists, stays, ladders, slings, hangers, blocks, pulleys, braces, irons, ropes, and other devices which shall be so constructed, placed and operated as to give proper protection to a person so employed.”
A trio of the Court of Appeals’ cases — Salazar v Novalex Contr. Corp. (18 NY3d 134 [2011]), Ortiz v Varsity Holdings, LLC (18 NY3d 335 [2011]), and Broggy v Rockefeller Group, Inc. (8 NY3d 675 [2007]) — endorsed a “commonsense” or “practical realities” approach in construing section 240 (1).[13] In Salazar, the Court of Appeals held that section 240 (1) was inapplicable to an accident which occurred when the worker, while walking backwards across the floor and pulling concrete with a rake held in front of him, stepped into a trench. The Salazar Court *1000 rejected the worker’s argument that the trench should have been covered or otherwise barricaded in such a way as to prevent his fall into the trench. The use of a cover or barricade would have been unworkable, the Salazar Court noted, because the objectives of the work plan included filling with concrete the very trench into which the worker fell. “Given that [section] 240 (1) should be construed with a commonsense approach to the realities of the workplace at issue,” the defendants were granted summary judgment dismissing this claim (18 NY3d at 140).
Here, it is undisputed that the trench was required to be open to enable plaintiff and his colleagues to work in it.[14] Plaintiff cannot (and does not) claim that the trench should have been covered with plates or other material at the time of his accident. More fundamentally, he has been unable to demonstrate what safety devices should have been made available to protect him — as he was walking on the flange — from falling into the trench. His initial suggestion (made by way of an expert affidavit) that “[t]he rubber . . . strip that extended over the edge of the beam . . . [should have been] shored or braced underneath to ensure that anyone stepping on the strip would not fall into the trench,”[15] is rebutted by the uncontradicted pretrial testimony of a witness from Roadway Contracting, stating that, as a matter of construction practice, rubber strips and steel plates are removed together.[16] Plaintiffs additional suggestion (also made by way of an expert affidavit) — that “the perimeter of the trench [should have been] . . . guarded by safety railings, barricades or fence[,] and the trench sheeting and shoring [should have been] . . . extend[ed] above the *1001 ground (street) surface to prevent a fall into the trench”[17]— ignores the time and the place of his accident. The relevant point of inquiry is after plaintiff started walking on the flange. Once he started walking on the flange, no safety railings, barricades or fences could have prevented his fall into the trench, as such devices can only be placed outside the trench, whereas the flange ran inside and along the four walls of the trench. Likewise, no trench sheeting or shoring could have been extended above the roadway because the I beam (which included the flange) served as the upper support for the trench to prevent a cave-in. Thus, plaintiff has not demonstrated what protective devices, if any, would have prevented his accident — bearing in mind, once again, that what is relevant is what he was doing at the time of his accident. Under Salazar’s commonsense approach to the realities of the workplace at issue, the trench was required to stay open to enable plaintiff and his crew to work in it, and no safety device was available to protect him from falling into the trench after he started walking on the flange to reach the trench entrance.
In Ortiz and Broggy, the Court of Appeals addressed a related point as to whether a worker was required to stand on a particular item from which he fell. In Ortiz, a worker was injured when he fell to the ground off a six-foot-deep dumpster. He asserted that his task of filling the dumpster and rearranging its contents as it filled up required him to stand on an eight-inch-wide ledge at the top of the dumpster. The Ortiz Court noted that it must take into account the “practical differences” between the usual and ordinary dangers of a construction site, and the extraordinary elevation tasks envisioned by section 240 (1) (18 NY3d at 339). The Ortiz Court found an issue of fact as to, inter alia, whether the injured worker was required to stand on or near the eight-inch-wide ledge to perform his task. In this regard, the following excerpt from Ortiz is crucial to the analysis of plaintiffs section 240 (1) claim in this case:
“[W]e agree with defendants that Ortiz’s cross motion for summary judgment was properly denied. To recover under section 240 (1), Ortiz must establish that he stood on or near the ledge at the top of the dumpster because it was necessary to do so in order to carry out the task he had been given (see Broggy v Rockefeller Group, Inc., 8 NY3d 675, 681 [2007]). Ortiz failed to adduce evidence, through testimony *1002 or other means, to establish what he asserted in his affidavit — that he was required to stand on or near the ledge. While that assertion is enough, in the context of this case and without contradictory evidence from defendants, for plaintiff to ward off summary judgment, it is not sufficient by itself for plaintiff to win summary judgment” (id. at 339-340 [emphasis added]).
In Broggy, a decision on which Ortiz relied, the Court of Appeals similarly focused on whether the injured worker was required to stand on a particular item (in that case, a desk) to perform his task. Unlike the situation in Ortiz, the facts in Broggy were clear that the worker in that case was not required to stand on the desk to perform his work. As the Broggy Court held:
“[Plaintiff] asserted that he had to stand on the desk, but provided no evidence to show that this was because he was required to work at an elevation to clean the interior of the windows. The desk may have been in plaintiff’s way, or it may have been easier for him to reach the top of the windows while standing on the desk, or it may have been quicker for him to climb on the desk than to seek further assistance to move it. To recover under section 240 (1), however, plaintiff must establish that he stood on the desk because he was obliged to work at an elevation to wash the interior of the windows” (8 NY3d at 681 [emphasis added]).
Under Ortiz and Broggy, the joint venture defendants are entitled to the dismissal of plaintiffs section 240 (1) claim because he was not required to walk on the flange to arrive at the trench entrance. Plaintiffs pretrial deposition testimony, as reproduced in the margin, demonstrates that his walking on a narrow flange was a shortcut in the service of convenience.[18] A flange with the width of about 12 inches was not a passageway under the circumstances of this case, and it was certainly not *1003 designed for any such use. No one, absent an emergency, would use such a narrow flange to walk on,[19] and plaintiffs desire to return to his jobsite from his coffee break was not an emergency. He needlessly exposed himself to an elevation risk by walking on the flange to reach the trench entrance instead of doing so from the ground. In fact, when he departed from the trench for his coffee break, he did not walk on the flange. In opposition to the joint venture defendants’ cross motion, plaintiff has failed to raise a triable issue of fact as to whether he was provided with an adequate safety device and, if not, whether its absence was a proximate cause of his accident.[20] Accordingly, the *1004 branch of the joint venture defendants’ cross motion for summary judgment dismissing plaintiffs Labor Law § 240 (1) claim against them is granted; conversely, the branch of plaintiff’s motion for partial summary judgment on liability under Labor Law § 240 (1) against them is denied (see McLean v 405 Webster Ave. Assoc., 98 AD3d 1090, 1095 [2d Dept 2012]).
Plaintiffs Labor Law § 241 (6) Claim
Labor Law § 241 (6) requires owners and contractors to provide reasonable and adequate protection and safety for workers and to comply with the specific safety rules and regulations promulgated by the Commissioner of the Department of Labor. To support a viable cause of action under section 241 (6), a plaintiff must demonstrate that his injuries were proximately caused by a violation of an Industrial Code provision that is applicable given the circumstances of the accident and that sets forth a concrete standard of conduct (see Parker v 205-209 E. 57th St. Assoc., LLC, 100 AD3d 607, 608 [2d Dept 2012]). Plaintiff relies on Industrial Code (12 NYCRR) §§ 23-1.7 (b) (1) (i)-(ii) and 23-4.2 (h), each of which is sufficiently specific to support a cause of action under section 241 (6) (see Scarso v M.G. Gen. Constr. Corp., 16 AD3d 660, 661 [2d Dept 2005], lv dismissed 5 NY3d 849 [2005]).
Industrial Code § 23-1.7 (b) (1) (i)-(ii) provides, in relevant part, that “[e]very hazardous opening into which a person may step or fall shall be guarded . . . by a safety railing,” and that “[w]here free access into such an opening is required by work in progress, a barrier or safety railing . . . shall guard such opening[,] and the means of free access to the opening shall be a substantial gate.” Further, Industrial Code § 23-4.2 (h) states, in relevant part, that “[a]ny open excavation adjacent to a sidewalk, street, highway or other area lawfully frequented by any person shall be effectively guarded.” Here, the trench, which was adjacent to areas lawfully frequented by workers, was undisputedly a hazardous opening. If plaintiff’s pretrial testimony is credited, no safety railings surrounded the trench at the time of his accident.[21] Thus, the joint venture defendants have failed to meet their initial burden of establishing that they *1005 did not violate the aforementioned regulations, that these regulations were not applicable to the facts of this case, or that their violation was not a proximate cause of plaintiffs accident (see Osorio v Kenart Realty, Inc., 35 AD3d 561, 562-563 [2d Dept 2006]). Accordingly, the branch of the joint venture defendants’ cross motion for summary judgment dismissing plaintiffs Labor Law § 241 (6) claim, to the extent premised on the alleged violation of Industrial Code §§ 23-1.7 (b) (1) (i)-(ii) and 23-4.2 (h), is denied without regard to the sufficiency of plaintiffs opposition papers.[22]
However, by failing to contest the joint venture defendants’ prima facie showing regarding the inapplicability of the following provisions, plaintiff has abandoned his Labor Law § 241 (6) claim to the extent premised on (1) Industrial Code (12 NYCRR) §§ 23-1.7 (a), (b) (1) (iii); (2); (d), (e), (f); 23-1.8 (c) (2); 23-1.15, 23-1.16, 23-1.32, 23-3.3 (f), (g); 23-3.4 (b); 23-4.1 (a)-(b); 23-4.2 (a)-(g), (i)-(l); 23-4.3, 23-4.4 and 23-4.5; (2) Administrative Code of the City of New York former §§ 27-1032 (a)-(b); 27-1021 (a) (4); 27-1050 (a) and 27-1031 (e); and (3) the regulations issued under the Occupational Safety and Health Act.
Plaintiffs Labor Law § 200/Common-Law Negligence Claim
Labor Law § 200 (1), which is a codification of the common-law duty of property owners and general contractors to provide workers with a safe place to work, requires that all work places “be so constructed, equipped, arranged, operated and conducted as to provide reasonable and adequate protection *1006 to the lives, health and safety of all persons employed therein or lawfully frequenting such places.” Where, as here, a plaintiff contends that an accident occurred because a dangerous condition existed on the premises where work was performed, an owner moving for summary judgment dismissing the Labor Law § 200/common-law negligence claim bears the initial burden of making a prima facie showing that it neither created the dangerous condition nor had actual or constructive notice of its existence (see Azad v 270 5th Realty Corp., 46 AD3d 728, 730 [2d Dept 2007], lv denied 10 NY3d 706 [2008]). There is no allegation on plaintiff’s part that either the City or the Transit Authority had anything to do with the trench, the flange, or the rubber strips.[23] In opposition to the City’s and the Transit Authority’s prima facie showing of entitlement to judgment as a matter of law, plaintiff has failed to raise a triable issue of fact as to whether these defendants had constructive notice of an allegedly dangerous condition.
On the other hand, the court reaches a contrary conclusion as to plaintiff’s Labor Law § 200/common-law negligence claim against the joint venture. Although the joint venture has established that it lacked control over the method of plaintiffs work, it has failed to meet its burden of showing that it did not breach its duty to take reasonable care in securing the safety of plaintiff’s work area. In particular, the joint venture, which conceded that its employees inspected the I beams (and hence the flanges),[24] had “the authority to control the activity bringing about the injury to enable it to avoid or correct an unsafe condition” (Russin v Louis N. Picciano & Son, 54 NY2d 311, 317 [1981]; Piazza v Frank L. Ciminelli Constr. Co., Inc., 2 AD3d 1345, 1349 [4th Dept 2003]).
*1007 Cross Claims
Even though the joint venture defendants are represented by single counsel, their cross claims against one another remain viable. Due to the fact that it is unclear at this stage of the action whether or not any (or all) of the joint venture defendants are liable to plaintiff, dismissal of their cross claims against one another is premature. Therefore, the branch of the joint venture defendants’ motion that seeks dismissal of their cross claims against one another is denied as premature (see Perri v Gilbert Johnson Enters., Ltd., 14 AD3d 681, 685 [2d Dept 2005]). However, because, as discussed below, all claims against Roadway Contracting are dismissed, its cross claims against the joint venture defendants are also dismissed.
Claims/Cross Claims against Roadway Contracting
The court writes separately to address plaintiffs claims and the joint venture defendants’ cross claims against Roadway Contracting. The witness for Roadway Contracting (Robert Ban-non) testified that Roadway Contracting (1) did not use I beams or other types of steel for shoring its trenches in plaintiffs work area (rather, it used only timber-wood sheeting for shoring its trenches); (2) did not supply, install, or remove any rubber strips for the trench at issue; and (3) did not supervise the work of plaintiff or his coworkers (Bannon pretrial deposition tr at 25, 27, 30, 32, 33, 37, 47, 49, 58, 60). This uncontroverted deposition testimony, coupled with the relevant daily construction report for October 31, 2005 (the 7 a.m. to 3:30 p.m. shift) showing that Roadway Contracting had no employees at the construction site at the time of plaintiffs accident, establishes prima facie that Roadway Contracting had nothing to do with the installation of the I beam shoring, the placement and removal of the rubber strips, the securing of the subject trench, or the happening of the accident. In opposition, plaintiff and the joint venture defendants have failed to demonstrate a triable issue of material fact, as their arguments rest on gross misinterpretation of Mr. Bannon’s pretrial testimony.[25] Accordingly, the motion of Roadway Contracting is granted in its entirety, and *1008 Roadway Contracting is dismissed from this action (see Kwoksze Wong v New York Times Co., 297 AD2d 544, 549 [1st Dept 2002]).[26]
Conclusion
For the above-stated reasons, it is ordered that plaintiffs motion in sequence number 6 for partial summary judgment on liability under Labor Law § 240 (1) is denied in its entirety; and it is further ordered that the motion of Roadway Contracting in sequence number 7 for an order granting it summary judgment dismissing plaintiffs complaint and the joint venture defendants’ cross claims insofar as asserted against it is granted in its entirety; plaintiffs complaint and the joint venture defendants’ cross claims insofar as asserted against it are dismissed; the action is severed and continued against the joint venture defendants; the caption is amended to delete Roadway Contracting from this action; and it is further ordered that the joint venture defendants’ cross motion in sequence number 8 for an order granting each of them summary judgment dismissing plaintiffs complaint and codefendants’ cross claims insofar as asserted *1009 against each of them is granted to the extent that (1) the cross claims of Roadway Contracting against each of the joint venture defendants are dismissed; and (2) plaintiffs claims and cross claims against each of the joint venture defendants are dismissed, except for (a) plaintiffs Labor Law § 241 (6) claim, based on the alleged violation of Industrial Code §§ 23-1.7 (b) (1) (i)-(ii) and 23-4.2 (h), against each of the joint venture defendants; (b) plaintiffs Labor Law § 200/common-law negligence claim against the joint venture; and (c) cross claims by and among the joint venture defendants inter se; and the claims in each of three aforementioned categories (a) through (c) shall survive and remain unaffected by this decision, order, and judgment.

. Plaintiff further alleged that defendants violated Labor Law § 240 (2)-(3) that is applicable to scaffolding or staging. As defendants correctly point out, this claim is without merit because plaintiff did not work on a scaffolding or staging at the time of his accident. Because plaintiff does not address this claim in his opposition papers, it is deemed abandoned (see Genovese v Gambino, 309 AD2d 832, 833 [2d Dept 2003]).

. During the pendency of this action, an involuntary chapter 7 petition was filed against Roadway Contracting on March 30, 2010, in the District Court for the Eastern District of New York. Thereafter, by order, dated July 9, 2010, the bankruptcy case was dismissed with the petitioning creditors’ consent (see In re Roadway Contr., Inc., ED NY, index No. 10-42708-CEC). The dismissal of the bankruptcy case dissolved the then-existing bankruptcy-imposed stay of all pending litigation against Roadway Contracting and thereby enabled plaintiff to resume the prosecution of this action against it.

. None of the parties have attached a copy of the note of issue to their moving papers. The County Clerk’s file shows that the note of issue in this action was filed on December 29, 2011. As such, in the absence of a court-ordered extension of time to move, the last day to move for summary judgment was February 27, 2012 (see Kings County Uniform Civ Term Rules part C [6] [requiring summary judgment motions to be made on or by 60 days from the filing of the note of issue]). Plaintiff and Roadway Contracting were the only parties to move on or before that date. Nevertheless, the joint venture defendants’ belated joint cross motion, served on May 22, 2012, may be considered to the extent that it involves the identical (or nearly identical) issues and proof already properly before the court in the timely motions of plaintiff and Roadway Contracting as the court may address these issues through its power to search the record under CPLR 3212 (b) (see McCallister v 200 Park, L.P., 92 AD3d 927, 928 [2d Dept 2012]).

. The court has not considered an undated memo from “Bruce” to “Chris” purporting to explain the import of the City’s agreement with Empire City Subway Co., Ltd. This memo was submitted by the joint venture defendants’ counsel as a cover to the City’s agreement.

. A trench is “[a]n excavation having a bottom width less than twice the depth of such excavation” (12 NYCRR 23-1.4 [b] [21]).

. See Tornabene examination before trial (EBT) tr at 20, lines 3-5 (“[The construction site] was fenced in and you had the concrete barriers around where pedestrians could walk”); at 20, lines 11-12 (stating that the trenches were not accessible by the general public).

. A flange is the horizontal portion of an I beam (see Ingenito v City of New York, 2011 NY Slip Op 33382[U], *3 n 1 [Sup Ct, NY County 2011]).

. See Tornabene EBT tr at 126, lines 12-17 (“Q. When you came out of the hole [i.e., the trench] to get coffee, did you walk back over that same metal beam that you eventually had your accident on, on your way to get coffee? A. No. A different way”).

. As he described his accident, “[t]he rubber was part of the beam but it wasn’t, so the rubber just gave way under my weight, and that is what made me go down” (pretrial deposition tr at 46-47). At his pretrial deposition, he denied slipping off the flange (id. at 130-131). In contrast, at his January 4, 2006 General Municipal Law § 50-h examination, he described his accident as a slip and fall (see tr at 17 [“I came up for a little break(,) then I went back down in(to) the ()hole (i.e., the trench) and as I was about to go down the second time that’s when I slipped and I fell”]; at 30 [“I just slipped”]). His initial explanation of his accident as a slip and fall is consistent with a workers’ compensation C-3 report which he signed on the third day after his accident when he likewise described his accident as a “slip & fall on a high beam at work.”

. In the interest of brevity, discussion of the well-settled law regarding summary judgment is omitted (see e.g. Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]).

. As explained by one court, Empire “owns communication conduits under the streets of New York City. It leases space in its conduits to companies having lawful power to operate communication conductors in New York City” (Matter of New York State Cable Tel. Assn. v Public Serv. Commn., 87 AD2d 288, 289 [3d Dept 1982]).

. See generally George M. Heymann, New York’s Scaffold Law and the Evolution of Elevation, 85 NY St BJ 10, 17 (Jan. 2013).

. The fact that the trench had to remain open for plaintiff to work in distinguishes this case from the appellate decisions in which the trench or other opening into which a worker fell was required to be closed (see Durando v City of New York, 105 AD3d 692, 695 [2d Dept 2013]; Valensisi v Greens at Half Hollow, LLC, 33 AD3d 693, 695 [2d Dept 2006]).

. (See expert aff of Kathleen Hopkins, RN, CSSM, Feb. 24, 2012, H 10.) Although Ms. Hopkins’ affidavit was executed in New Jersey and is not accompanied by a certificate of conformity as required by CPLR 2309 (c), the requirement of certification may be dispensed with where, as here, the person administering the oath for an out-of-state affidavit is a notary (see JPMorgan Chase Bank, N.A. v S.I. Wood Furniture Corp., 34 Misc 3d 1214[A], 2012 NY Slip Op 50074[U] [Sup Ct, Kings County 2012] [collecting authorities]).

. (See Bannon tr at 71, lines 3-6 [“Q. When the plate is removed, what happens to the rubber, does it remain there, is it removed? A. No, we pick it up”].) Plaintiff’s expert does not address the procedure for applying and removing the rubber strips.

. See expert aff of Kathleen Hopkins ¶ 10.

. At plaintiffs pretrial deposition, defense counsel engaged him in the following colloquy:
“Q. As you came back from the coffee break walking to the ladder, was there any particular reason why you walked on the metal [I] beam and not on the macadam [i.e., the roadway] on the street?
“A. No.
“Q. Was there anything blocking your ability to walk?
*1003 “A. It was just a shortcut.
“Q. Was there anything that was blocking your ability to walk on the pavement or the roadway itself?
“A. No ... .
“Q. When you said it just a shortcut, what did you mean by that?
“THE WITNESS [i.e., Plaintiff]: I was going to get my coffee[;] it was a shortcut for me to go back to the job site and have my coffee because we only take coffee for about ten or 15 minutes and then go back to work. Instead of me walking all the way around.
“Q. When you say walking all the way around, all the way around what?
“A. All the way around the whole fence.
“Q. That is the fence that surrounds the entire job site?
“A. Yes” (pretrial deposition tr at 132, line 24; at 135, line 2 [emphasis added]).

. No deposition testimony or affidavits from plaintiff’s two crew members who worked with him in the trench before his coffee break and who, according to him, witnessed his accident have been submitted to the court.

. Plaintiff relies on inapposite decisions and ignores that (1) the flange did not serve as the exclusive route to and from the trench entrance, inasmuch as he conceded that he could have reached the trench entrance without walking on the flange; and (2) the flange ran alongside the trench, rather than across the trench. (See Ventimiglia v Thatch, Ripley & Co., LLC, 96 AD3d 1043, 1044 [2d Dept 2012] [several planks had been placed across an opening to serve as the only way into and out of the construction site, plaintiff was instructed by his foreman to bring some lumber onto the site, and, as he was walking across the planks, the planks “opened up,” causing him to fall into the opening]; Grigoropoulos v Moshopoulos, 44 AD3d 1003 [2d Dept 2007] [the worker, who was required to stand upon a makeshift plywood platform to perform his task, was injured when the plywood gave way under him causing him to fall into the basement below]; Figueiredo v New Palace Painters Supply Co. Inc., 39 AD3d 363 [1st Dept 2007] [the plywood from which the worker fell extended across the beams and served as the means to traverse an opening]; John v Baharestani, 281 AD2d 114 [1st Dept 2001] [a worker fell when some planks he had placed on top of the metal beams to serve as a platform to enable him to carry bricks from one destination to another collapsed under his weight].)

. The day after his accident (Nov. 1, 2005), plaintiff returned to the construction site, observed the trench in which he had his accident, but, despite having a camera with him, did not take pictures of it. Instead, he took four photographs of other trenches near the location where he was working. Two of these photographs are before the court (see motion of Roadway *1005 Contracting, exhibit C [last page]). One of these photographs (plaintiff’s exhibit D) does not reflect guardrails, whereas the other one (plaintiffs exhibit C) does. According to the defense expert (aff ¶ 6), a portable railing system was provided at the construction site. On the other hand, plaintiff testified (General Municipal Law § 50-h examination, Jan. 4, 2006, at 31) that guardrails around the trenches were installed only after his accident. These issues of credibility are for the jury to resolve (see Lalla v Connolly, 17 AD3d 322, 323 [2d Dept 2005]).

. The court’s conclusions that plaintiff may have a viable Labor Law § 241 (6) claim, but not a viable Labor Law § 240 (1) claim, are not inconsistent with each other. Labor Law § 240 (1), a strict liability statute, protects workers from elevation-related dangers to which they are necessarily exposed as a requirement of their work. In contrast, Labor Law § 241 (6), a negligence-type statute, protects workers from work site dangers to which they may (or may not) be exposed. By way of illustration, note the broad language in the relevant Industrial Code regulations underpinning the Labor Law § 241 (6) claim in this case: “[e]very hazardous opening into which a person may step or fall” and “[a]ny open excavation adjacent to a sidewalk, street, highway or other area lawfully frequented by any person” (§§ 23-1.7 [b] [1] [i]; 23-4.2 [h] [emphasis added]).

. The joint venture’s project superintendent Geoffrey Fairclough testified that he interacted with the Transit Authority’s project engineer whose involvement in the project was to “oversee all inspectors” and to serve as “a liaison between field inspections and the main office for the . . . Transit Authority” (Fairclough pretrial deposition tr at 51). According to Mr. Fairclough, the Transit Authority’s manual labor was limited to “locat[ing] utilities and document[ing] and tagg[ing] which of those utilities were live or dead” (id. at 51-52).

. See Fairclough (joint venture) tr at 67-68 (“Q. Did the [J]oint [V]enture perform any inspections of those rubber strips to determine whether or not they were secured? ... A. Inspections were performed of the deck system [of which the I beams were part], Q. And who from the [J]oint [V]enture performed those inspections? A. It would have been the quality control department, the quality engineer”); see also Fairclough tr at 108 (“Q. You mentioned earlier that decking system would have been inspected for the [J]oint [V]enture by the quality engineer. A. Correct”).

. A single example will suffice to illustrate the point. The joint venture defendants argue that a witness from Roadway Contracting “did admit that his company used rubber stripping and steel decking plates at this job site” (counsel’s opening affirmation 11 30 [citing tr at 60, line 22]). The relevant portion of the transcript of Mr. Bannon’s pretrial deposition starting at page 60, *1008 line 12, and continuing to page 62, line 3, however, refutes their argument. As reproduced below, the transcript demonstrates that Roadway did not use steel plates in plaintiffs work area:
“Q. . . . Roadway Contracting provided no rubber isolation or no rubber barriers or bumpers of any kind for any work that it performed for the South Ferry project; is that correct?
“A. I said we didn’t do. I don’t know if we put any kind of rubber on our plates, I don’t know that. I could tell you we didn’t do that (indicating).
“[Roadway Counsel]: Pointing to Exhibit IB [which was a photograph of a trench in the location in which plaintiff fell}.
“Q. Was it necessary for Roadway to utilize any plates for this particular job?
“A. Yes.
“Q. Where did it utilize plates for this particular job?
“A. I know we used plates right across the street from where the MTA facility was, right at the entrance to the park. . . .
“Q. Just to clarify, your company did use steel vehicular plates across from the MTA offices, but that was on Broadway; is that correct?
“A. Correct.
“Q. That was not shown in the pictures marked today as Plaintiff’s IB for identification, is that right?
“A. Correct” (emphasis added).

. The grounds for dismissal of plaintiffs Labor Law § 240 (1) claim, as set forth above with respect to the joint venture defendants, apply with equal force to Roadway Contracting.